UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

WALKINS CONTRERAS,                          :

                          Petitioner,       :

                                            :

        - against -                         :

                                            :

DALE ARTUS, Superintendent, Clinton         :
Correctional Facility,

                                            :

                          Respondent.       :

--------------------------------------------------------x

```
┌─────────────────────────────────┐
│  USDC SDNY                       │
│  DOCUMENT                        │
│  ELECTRONICALLY FILED            │
│  DOC #: _____        │
│  DATE FILED:  9/11/12  _____    │
└─────────────────────────────────┘
```

**REPORT AND
RECOMMENDATION
TO THE HONORABLE
JED S. RAKOFF**[*]

09 Civ. 7940 (JSR) (FM)

**FRANK MAAS,** United States Magistrate Judge.

         Petitioner Walkins Contreras ("Contreras") brings this habeas corpus

proceeding, pursuant to 28 U.S.C. § 2254 ("Section 2254"), to challenge his conviction,

following a jury trial in Supreme Court, New York County, on numerous felony charges

arising out of his violent sexual assault of his estranged wife in an apartment while her

child was present.[1]  On March 11, 2005, Justice Lewis Bart Stone, before whom the case

was tried, sentenced Contreras, as a second felony offender, to an aggregate term of

twenty years in jail.

_____

         [*]     This Report and Recommendation was prepared with the assistance of
Christopher Mirabella, a student at the Fordham University School of Law.

         [1]     Contreras was convicted on one count each of Rape in the First Degree,
Kidnapping in the Second Degree, Burglary in the First Degree, Attempted Assault in the First
Degree, and Endangering the Welfare of a Child, and two counts of Unlawful Imprisonment in
the First Degree.

During the trial, following a hearing that was partially ex parte, Justice Stone directed Contreras' counsel to withhold from Contreras for the duration of the trial information concerning the existence and contents of a notepad entry made by Contreras' wife ("Note").  As a consequence, in his petition ("Petition" or "Pet."), Contreras asserts that he was denied (a) his Sixth Amendment right to the effective assistance of counsel, and (b) both his Sixth Amendment right to confront a witness against him and his Fourteenth Amendment right to be present at all material stages of his trial by virtue of his exclusion from all proceedings regarding the Note.

For the reasons set forth below, the Petition should be denied.

I.      Facts[2]

    A.      Trial

        1.      People's Case

The evidence at trial would have permitted a reasonable juror to find as follows:

After Contreras met complainant Y.A. ("Complainant")[3] in a nightclub in May 2000, their relationship accelerated quickly.  By September 2000, Contreras had moved into the Complainant's apartment in Manhattan, where the couple lived with her son from a previous marriage.  On May 6, 2002, Contreras and the Complainant were married.  (Pet'r's Mem. at 4).

Eight months after the wedding, the couple's relationship began to deteriorate.  By April 2003, the Complainant suspected that Contreras was having an

---

[2]      Both sides have provided the Court with the transcript of the hearing, but the remainder of the trial transcript is not part of the record before this Court.  The facts nevertheless do not appear to be in dispute.  I therefore have relied on the parties' briefs for this summary of the trial evidence.  See Stevenson v. Strack, No. 96 Civ. 8429 (DC), 1999 WL 294805, at *1 n.1 (S.D.N.Y. May 11, 1999) ("Rule 5 of the Rules Governing § 2254 Cases permits the use of 'a narrative summary of the evidence' in lieu of an unavailable state court transcript"); see also Bundy v. Wainwright, 808 F.2d 1410, 1415 (11th Cir. 1987) ("If no transcript is available, a narrative summary may be furnished").

      Citations to "Pet'r's Mem." refer to the Petitioner's Memorandum of Law in Support of Petition for a Writ of Habeas Corpus.  (ECF No. 13).  Citations to "Resp't's Mem." refer to the Respondent's Memorandum of Law in Opposition to Petition for a Writ of Habeas Corpus.  (ECF No. 20).  "App." refers to the Appendix to the Pet'r's Mem.  (ECF No. 31).  "Ex." refers to the exhibits annexed to the Declaration of Alyson Gill in Opposition to Petition for a Writ of Habeas Corpus, dated August 20, 2010.  (ECF No. 19).

[3]      I have referred to the victim by her initials to protect her identity.  See N.Y. Civil Rights Law § 50–b.

affair, and, in October 2003, she initiated divorce proceedings against him. (Pet'r's Mem. at 5; Resp't's Mem. at 4). In November 2003, the Complainant began dating another man. (Id.). The Complainant's new relationship led to erratic and aggressive behavior on the part of Contreras over the following months. On several occasions, Contreras would wait for the Complainant to arrive home from work and question her about her new relationship. (Id.). A week before the incident, Contreras followed the Complainant to the train station, rode the train with her, and implored her to take him back. The Complainant refused. (Resp't's Mem. at 5).

On the morning of February 10, 2004, the Complainant and her son were getting ready to leave their apartment. As they were exiting, the Complainant saw Contreras standing in the doorway. (Pet'r's Mem. at 12; Resp't's Mem. at 5). After Contreras pushed the two back into the apartment, the Complainant screamed and told her son to call "911." (Id.). The child tried to run to his mother's bedroom to make the call, but tripped and fell before he could do so. (Resp't's Mem. at 5). Contreras grabbed the Complainant, covered her mouth and nose with his hand, and told her that he had come to kill her. (Pet'r's Mem. at 12; Resp't's Mem. at 5). With her son standing a few feet away, Contreras then revealed that he was carrying a knife, and ordered the Complainant into her bedroom. (Id.).

Contreras proceeded to push the Complainant and her son through the living room. During the struggle, the Complainant's purse fell to the floor. Several items fell out of her purse, including a notepad that she used to write notes to herself and her

4

cell phone, which landed underneath the sofa.  (Id.).  When the Complainant bent down to clean up the mess, she noticed that the cell phone (which she later hid in the bathroom) was on the floor.  She put it under her clothes.  (Pet'r's Mem. at 12;  Resp't's Mem. at 6).  Contreras then told the child to go to his room and ordered the Complainant into her bedroom.  (Id.).

When Contreras and the Complainant were in the bedroom, Contreras directed her to undress so that he could have sex with her.  (Id.).  When the Complainant refused to remove her clothes, Contreras brandished the knife, telling her, "do it now [or] I am going to kill you."  (Resp't's Mem. at 6).  A struggle ensued, during which Contreras slapped and punched the Complainant as he attempted to remove her clothes.  (Id.).  The Complainant tried to resist by pushing and scratching Contreras.  (Id.).  Eventually, with the knife still in his hand, Contreras was able to subdue the Complainant, climb on top of her, and rape her.  (Pet'r's Mem. at 12;  Resp't's Mem. at 6).

The Complainant implored Contreras to leave the apartment, offering not to press charges if he complied, but he refused.  The Complainant then asked for something to drink.  When Contreras left the bedroom to get a glass of water, the Complainant reached for a phone in the corner of her bedroom and tried to dial 911.  (Pet'r's Mem. at 13;  Resp't's Mem. at 7).  Before she could complete the call, Contreras returned to find her on the phone, and he once again became violent.  (Id.).  Contreras unplugged an extension cord from an iron that the Complainant kept at the foot of the bed, placed the

5

cord around her neck, forced her face-first into a pillow, and started to choke her.  (Id.).

The Complainant was able to keep her fingers between the cord and her neck as the two

struggled.  (Id.).

Contreras eventually stopped choking the Complainant and began to

question her about her boyfriend.  (Id.).  Next, Contreras brought the Complainant to her

son's room and began to question him about his mother's boyfriend.  (Pet'r's Mem. at 13;

Resp't's Mem. at 8).  The child gave Contreras the name of the boyfriend, but little other

information.  (Id.).

After questioning the Complainant's son, Contreras brought the

Complainant back to her room and told her once again that she was "going to die that

day."  (Resp't's Mem. at 8).  He forced the Complainant to write a goodbye letter to her

son, brought her to his room so that she could read it to him, and then returned her to her

bedroom.  (Pet'r's Mem. at 13;  Resp't's Mem. at 8).  Once in the bedroom, Contreras got

on top of the Complainant and demanded that she touch his chest and perform oral sex on

him.  (Id.).  Despite the Complainant's repeated protests, Contreras once again forcibly

had sex with the Complainant.  (Resp't's Mem. at 9).

The ordeal continued as Contreras kept questioning the Complainant about

her boyfriend, punching her, and directing her to write another goodbye letter – this time

to her mother.  (Id.).  A series of failed attempts to call for help followed as the

Complainant tried to isolate herself in the bathroom, only to be interrupted by Contreras.

(Pet'r's Mem. at 13;  Resp't's Mem. at 9).  Finally, after convincing Contreras to get a

drink for her son, the Complainant was able to drag her "froze[n]" son into the bathroom and lock the door.  (Pet'r's Mem. at 13-14;  Resp't's Mem. at 10).  The Complainant called 911 and spoke to an operator.  (Id.).  The police arrived several minutes later.  (Id.).  Upon their arrival, the Complainant emerged from the bathroom.  Contreras then was found hiding in a hallway closet.   (Resp't's Mem. at 11).  After the Complainant was taken to the hospital, the police recovered her notepad from the scene.  (App. at 7).

   2. <u>Defense Case</u>

   Contreras neither testified nor presented any evidence at trial.

 B. <u>Trial Court's Handling of the Note</u>

   On February 14, 2005, at the outset of the trial, the Assistant District Attorney ("ADA") informed the court that the police had recovered a notepad from the Complainant's apartment.  The ADA maintained that certain writing on the notepad was irrelevant, but nevertheless asked that it be reviewed <u>in camera</u>.  (Id. at 7, 10).  After a brief discussion, Justice Stone told Contreras' counsel ("Defense Counsel") that he intended to conduct an <u>ex parte</u> sealed proceeding in the jury room so that he could consider the ADA's application while also making a record for potential appellate review.  (Id. at 10).

   In the jury room, Justice Stone characterized the proceeding as an <u>ex parte</u> application for a protective order, during which he would determine whether the contents

of the Note were "Rosario material or perhaps even Brady material."[4]  (Id. at 11).  Justice

Stone then described the material that the ADA sought to withhold as

> a pad . . . approximately two and a half inches by four inches,
> on which there [are] certain words written. . . .  The pad
> seems to have four bullet points on it.  The first one says, I
> want you to open yourself to me.  The second one
> acknowledge me in bed.  When you are sleeping, parenthesis
> even though you are getting better, end parenthesis.  Third
> one is take me and fuck the shit out of me.  And the fourth
> one is get tested for.[5]

(Id. at 11-12).

As the ADA explained to Justice Stone, the Complainant was "adamant"

that the Note constituted a "personal letter" that she had written to her current boyfriend,

(who had also been her boyfriend at the time of the incident) and was not directed to

Contreras.  (Id. at 12).  For that reason, the ADA argued that the Note should be excluded

pursuant to Section 60.42 of the New York Criminal Procedure Law, commonly known

as the Rape Shield Law.  (Id.).  The ADA also expressed concern that if the Note were

revealed to Contreras, it would allow him to "fabricate further the defense" that the sex

was consensual.  (Id. at 13).  After hearing the ADA's proffer, Justice Stone directed that

the Complainant testify the next day as part of an in camera proceeding in which he

would "interrogate" her.  (Id. at 15).  Subsequently, when the Justice explained to

---

[4]    See People v. Rosario, 9 N.Y.2d 286 (1961); Brady v. Maryland, 373 U.S. 83
(1963).

[5]    The final bullet point was incomplete.  The Complainant testified that it referred
to her desire that her new boyfriend get tested for HIV.  (App. at 43).

Defense Counsel that the purpose of the continued <u>ex parte</u> proceeding was to "corroborate that the People have not been lied to," Defense Counsel responded by saying, "Just so the record is clear[,] I'm objecting to [the] entire proceeding." (<u>Id.</u> at 17).

The following day, after opening statements, the court continued the <u>ex parte</u> proceeding in the jury room. (<u>Id.</u> at 18-19). The Complainant testified that she had written the Note "maybe a month or over a month" before the incident. (<u>Id.</u> at 22). She further corroborated the ADA's assertion that the Note had not been intended for Contreras. (<u>Id.</u>). At that point, Justice Stone called Defense Counsel into the jury room without Contreras. (<u>Id.</u>). "In the interest of disclosure and . . . moving [the] trial along," Justice Stone revealed the contents of the Note to Defense Counsel, accompanied by a directive "not to disclose [the Note's contents] to [Contreras] or to any other person without prior order of the court." (<u>Id.</u> at 23). Defense Counsel acknowledged that he understood the instruction, which was modified so that he could discuss the Note with colleagues in his law office. (<u>Id.</u> at 23).

Following this exchange, Justice Stone found that the Note evidenced the Complainant's thoughts before she had reduced them to a letter. The Justice excluded any evidence concerning the Note "because [it did] not relate to [the] event and [was] in the nature of those things covered by the rape shield law." (<u>Id.</u> at 25). Defense Counsel objected strenuously, arguing that the Note furthered Contreras' defense to the burglary charge since Contreras intended to argue that he was in the Complainant's apartment legally and became violent only after he "learned . . . that [the Complainant] was involved

. . . with another man." (Id. at 26-27). Justice Stone noted that there was no evidence that Contreras had seen the Note, but that if Contreras were to "get[] on the stand" and testify that the Note was "what caused [him] to break," Defense Counsel could "make an application." (Id. at 27). Defense Counsel protested, stating: "I have to put him on the stand and wait [to] see what he says[?] That doesn't sound like very effective assistance of counsel." (Id.).

After vigorously contesting the applicability of the Rape Shield Law, Defense Counsel was allowed to question the Complainant, though Contreras remained outside the room while this occurred. (Id. at 35). During her continued testimony, the Complainant maintained that her purse had fallen after Contreras pushed her into the apartment and that, once she returned home from the hospital, she immediately noticed that the notepad was missing. (Id. at 39). She reiterated that she was unsure whether Contreras had seen the notepad during the incident, and that she intended to communicate the substance of the Note to her new boyfriend, not Contreras. (Id. at 40-41). Immediately after Defense Counsel completed this questioning, the trial resumed. (Id. at 43).

C.   Defense Summation

During his closing, Defense Counsel argued that Contreras was willing to take responsibility for his actions, but had been charged with crimes more serious than those for which he was responsible. (Pet'r's Mem. at 17). Despite being unable to discuss the contents of the Note, Defense Counsel maintained that there was no burglary

10

because Contreras had a right to be in the marital home.  (<u>Id</u>.).  Defense Counsel argued

further that there was no rape because the sex between Contreras and the Complainant

was consensual, emphasizing that there was a difference between "forcible compulsion"

and the "persistence and persuasion" that was a common theme in their relationship.

(<u>Id</u>.).  Defense Counsel also noted that at the end of the three-hour altercation, the

Complainant's only injuries were "some bruises and contusions."  (<u>Id</u>.).

       D.     <u>Verdict and Sentencing</u>

On February 17, 2005, the jury found Contreras guilty of one count each of

Rape in the First Degree, Kidnapping in the Second Degree, Burglary in the First Degree,

Attempted Assault in the First Degree, and Endangering the Welfare of a Child, and two

counts of  Unlawful Imprisonment in the First Degree.  (<u>Id</u>.).  The jury returned a verdict

of not guilty on a second count of Rape in the First Degree.  (<u>Id</u>.).  Additionally, the

People moved to dismiss a second count of Kidnapping in the Second Degree and a count

of Attempted Murder in the Second Degree as to which the jury had been unable to reach

a unanimous verdict.  (<u>Id</u>. at 17-18).

On March 11, 2005, Justice Stone sentenced Contreras to concurrent terms

of twenty years on the rape, kidnapping, and burglary counts, fifteen years on the

attempted assault count, one and one-half to three years on the unlawful imprisonment

counts, and one year on the count of endangering the welfare of a child.  (<u>Id</u>. at 18).

II.     Post-Trial Proceedings

    A.     Direct Appeal

        On July 21, 2006, Contreras' assigned appellate counsel ("Appellate Counsel") wrote a letter to Justice Stone seeking clarification of the breadth of his order directing Defense Counsel not to reveal to Contreras the contents or existence of the Note.  (Id.).  The court held a hearing regarding the application on October 19, 2006.  (App. at 44).  At that hearing, Justice Stone indicated that Appellate Counsel could disclose matters related to the in camera hearing to Contreras, subject only to counsel's good faith determination that the issue needed to be raised on appeal.  (Id. at 47).

        In Contreras' appellate brief, filed on March 20, 2007, Contreras argued that his conviction should be reversed on the grounds that (1) he was denied his Sixth and Fourteenth Amendment right to be present during all material stages of his trial because the court conducted the hearing and heard testimony regarding the relevancy of the Note outside Contreras' presence; (2) the trial court's order banning all communication between Defense Counsel and Contreras regarding the Note denied Contreras a fair trial and the effective assistance of counsel, in violation of the Fifth, Sixth, and Fourteenth Amendments; and (3) the trial court misapplied the New York Rape Shield Law and curtailed Contreras' right to confront the witnesses against him, in violation of New York law and the Sixth Amendment, by prohibiting any questioning of the Complainant at trial regarding the Note.  (Id.).

On January 3, 2008, the Appellate Division, First Department, unanimously affirmed Contreras' conviction.  People v. Contreras, 848 N.Y.S.2d 650 (2008).  In its decision, the Appellate Division concluded that Contreras was not deprived of his right to be present at a material stage of the trial because "there was no indication that [Contreras] had any knowledge of the [N]ote's existence."  Id. at 652.  Accordingly, "he could not have contributed in any meaningful way to the proceeding."  Id.

The Appellate Division further held that Contreras was not denied his right to effective assistance of counsel when the trial court prohibited Defense Counsel from disclosing the contents of the Note to him.  Id.  As the Appellate Division observed, the trial court's concern about "protecting [the Complainant] from an unnecessary invasion of her privacy" was a legitimate interest.  Moreover, the "limited ban" did not deprive Contreras of any constitutional rights since, "if he had in fact seen the [N]ote or was aware of its existence, he could have brought it to his counsel's attention."  Id.

Finally, the Appellate Division held that the Note could not have been withheld pursuant to the Rape Shield Law because it reflected the Complainant's "statements about herself" and thus was "not evidence of 'sexual conduct' within the meaning of the statute."  Id.  The Appellate Division nevertheless found that the trial court had "properly exercised its discretion in precluding the use of the [N]ote" because "all of [Contreras'] theories of relevance were based on far-fetched, speculative scenarios with no evidentiary support."  Id.

On June 10, 2008, Judge Eugene Pigott, Jr., of the New York Court of Appeals, granted Contreras leave to appeal on each of the grounds asserted before the Appellate Division.  (See Ex. E at 1-2).  Thereafter, following briefing, the Court of Appeals unanimously affirmed Contreras' conviction on April 7, 2009.  People v. Contreras, 12 N.Y.3d 268 (2009) ("Contreras II").[6]  In arriving at its decision, the Court of Appeals noted that it was "important to understand" that the limited goal of the ex parte proceeding was to determine whether the contents of the Note constituted Rosario or Brady material, and that "[n]othing in the record suggests that they were either" or gave any reason to doubt that they were "exactly what the [C]omplainant said they were – notes written at a different time on another subject."  Id. at 272.  Thus, as the Court of Appeals observed, the prosecution was erring on the side of caution by seeking a ruling, and there "quite likely" would have been no error had the prosecution taken it upon itself to withhold the Note without consulting the court.  Id.  As the Court of Appeals further observed, there "would surely have been no error if the court, having reviewed the [N]ote in camera and heard the prosecutor's representations concerning it, had decided without further proceedings that the [N]ote [was] not subject to either Rosario or Brady."  Id.  The Court of Appeals thus held that "the hearing was not only non-critical, but, as a matter of law, unnecessary."  Id. at 273.

The Court of Appeals also echoed the Appellate Division's assessment that the Note, "though irrelevant to the case, had a significant tendency to embarrass the

_____

[6]     Chief Judge Lippman took no part in the decision.  Id. at 286.

Complainant," who "might have been warranted in fearing worse than embarrassment if [it] had been communicated to [Contreras]." Id. Given the risk that Contreras might be released from incarceration after having been enraged by the Note's contents, the court held that there was ample justification for barring counsel from informing him of its existence. Id. As the Court of Appeals observed, although a "defendant is entitled to be personally present at all critical stages of a trial if his presence would contribute to the fairness of the proceedings," that rule is "inapplicable" when a hearing is, "as a matter of law unnecessary." Id. Additionally, "while communications between attorney and client should generally be unrestricted," "the disclosure by lawyer to client of an embarrassing and inflammatory document having nothing to do with the case is not a constitutionally protected communication." Id.

> B.     Petition

Contreras' Petition is dated August 21, 2009 and was timely received by the Pro Se Office of the Court on September 16, 2009. (See ECF No. 2; Resp't Mem. at 17 (conceding timeliness)). After counsel appeared on Contreras's behalf, Contreras filed a memorandum of law and appendix in support of his Petition on May 27, 2010. (ECF Nos. 13, 14). The Respondent filed his opposition papers on August 20, 2010. (ECF Nos. 19, 20). In those papers, the Respondent concedes that Contreras properly exhausted his state court remedies with respect to his claims. (Resp't Mem. at 18). On September 24, 2010, Contreras filed a reply memorandum. (ECF No. 21).

II.   <u>Discussion</u>

    A.   <u>Standard of Review</u>

       A habeas corpus petition is not a vehicle to relitigate every issue previously determined in state court.  <u>Herrera v. Collins</u>, 506 U.S. 390, 401 (1993).  Rather, a state prisoner seeking habeas relief under Section 2254 must show that he is "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petitioner bears the burden of proving, by a preponderance of the evidence, that his rights have been violated.  <u>Jones v. Vacco</u>, 126 F.3d 408, 415 (2d Cir. 1997).

       Section 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), provides, in part, that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was <u>contrary to</u>, or involved an <u>unreasonable application of</u>, clearly established Federal law, as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d)(1) (emphasis added).

       As the Second Circuit noted in <u>Jones v. Stinson</u>, the Supreme Court has "construed the amended statute so as to give independent meaning to 'contrary [to]' and 'unreasonable.'"  229 F.3d 112, 119 (2d Cir. 2000).  "Under the 'contrary to' clause, a

federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  Under the "unreasonable application" clause, a federal habeas court should "ask whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409.  This standard does not require that reasonable jurists would all agree that the state court was wrong.  Id. at 409-10.  Rather, the standard "falls somewhere between 'merely erroneous and unreasonable to all reasonable jurists.'"  Jones, 229 F.3d at 119 (quoting Francis S. v. Stone, 221 F.3d 100, 109 (2d Cir. 2000)).

Section 2254(d)(2) also authorizes the federal courts to grant a habeas writ when a claim considered on the merits in state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Finally, to the extent that a habeas petition challenges factual findings, Section 2254(e)(1) provides that "a determination of a factual issue by a State court shall be presumed to be correct" and "[t]he [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

 "If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody . . . violates the Constitution, that independent judgment should prevail."  Williams, 529 U.S. at 389.

17

B.      Right to Counsel

Contreras' first claim is that he was denied the right to counsel, in violation

of the Sixth Amendment, by virtue of the trial judge's ban on communications between

Defense Counsel and Contreras concerning the Note.  (Pet'r's Mem. at 1, 28-35).

The Sixth Amendment guarantees that a defendant in a criminal prosecution

shall have "the assistance of counsel for his defense."  U.S. Const. Amend. VI.  For that

reason, the Supreme Court has held that a seventeen-hour overnight ban on any

conversation between a defendant and his counsel, imposed to ensure that the defendant is

not coached between direct and cross-examination, is an overbroad and, therefore,

unconstitutional restriction on the right to counsel.  See Geders v. United States, 425 U.S.

80, 89-91 (1976).  There are instances, however, in which more narrowly circumscribed

bans have been upheld.  See e.g., Perry v. Leeke, 488 U.S. 272 (1989) (precluding

defendant from talking to counsel during a fifteen-minute recess between defendant's

direct and cross-examination to prevent coaching); United States v. Triumph Capital

Group, Inc., 487 F.3d 124, 133 (2d Cir. 2007) (barring attorney from discussing

defendant's testimony with him during morning, lunch, and evening recesses);[7] Morgan

v. Bennett, 204 F.3d 360 (2d Cir. 2000) (no Sixth Amendment violation despite court's

---

[7]        In Triumph Capital, the trial court originally entered an order at the Government's
request precluding any communication overnight between defense counsel and his client
concerning the defendant's testimony.  After the Government realized that this proscription
might be unconstitutional, see id. at 128 (citing United States v. Santos, 201 F.3d 953, (7th Cir.
2000)), the court lifted the order at approximately 8 p.m.  Id.  Although counsel was unable to
confer with his client at that late hour, the court afforded him additional time to do so before the
trial resumed the next morning.

directive that counsel not inform defendant that a witness who had been threatened by defendant's associates would testify the next day).

Contreras correctly notes that the length of the ban in this case far surpassed the length of the bans in prior cases. Indeed, Justice Stone's ban "lasted not just one lunch recess and not just one overnight recess but the entire duration of [Contreras'] trial." (Pet'r's Mem. at 28). In Contreras' view, this alone gives rise to a "constitutional violation far surpassing" that encountered in previous cases. (Id. at 29).

The temporal yardstick suggested by Contreras is too blunt an instrument for measuring the constitutionality of the proscription imposed in this case. As the Second Circuit has explained, "it is not the quantity of communication restrained but its constitutional quality" that determines whether the Sixth Amendment has been violated. United States v. Padilla, 203 F.3d 156, 160 (2d Cir. 2000). In Geders, the Supreme Court held that an overnight ban on all communication between a testifying defendant and his counsel is unconstitutional. Geders, 425 U.S. at 80. It is unclear, however, whether Geders applies at all where, as here, the defendant elects not to testify. If Geders is inapplicable, Justice Stone's ruling, and the New York Court of Appeals' decision affirming Contreras' conviction, cannot be considered an unreasonable application of clearly established federal law as determined by the Supreme Court.

In any event, even if Geders is controlling in circumstances where a defendant fails to testify, not every subject matter ban is per se unconstitutional. See, e.g., Morgan, 204 F.3d at 361 (affirming conviction despite overnight ban on

19

communication concerning prospective witness).  In this case, assuming that Justice

Stone's findings concerning the purpose of the Note are correct, the Note was irrelevant

to any issues that the jury would be asked to consider.  In his papers, Contreras has not

shown that any of Justice Stone's factual findings concerning the Note were unwarranted.

Accordingly, requiring Defense Counsel to refrain from discussing the Note with

Contreras was no more of an impediment to the defense than requiring that Defense

Counsel not discuss with Contreras a work by Shakespeare that Contreras had not read.

Such a ban – regardless of its duration – simply could not have prejudiced Contreras.

There is one conceivable circumstance, not supported by the record, in

which the trial court's ban potentially might have been prejudicial:  if Contreras read the

Note on the date of the incident, but later forgot that he had done so.  If that were so, a

reminder by counsel that the Note existed might have refreshed Contreras' recollection

and enabled him to testify that he entered the apartment with the Complainant's

permission but later reacted as he did after reading the Note.  While this approach likely

would have ensured his conviction on several of the charges, it might have spared him a

twenty-year concurrent sentence on the burglary charge.

The difficulty with this theory is that it is wholly speculative.  Indeed,

counsel was permitted to inform Contreras about the contents of the Note before

Contreras' appeal was filed.  Nevertheless, despite the availability of post-conviction

remedies under New York Law, <u>see</u> N.Y. Crim. Proc. Law § 440.10, Contreras has never

indicated to the state courts that he, in fact, saw the Note on the date of his arrest, much

less that it led him to engage in any of the conduct giving rise to his conviction.  A habeas petitioner obviously is not entitled to have his conviction set aside merely because his counsel speculates that some constitutional violation might have occurred.  See Woods v. Bartholomew, 516 U.S. 1, 8 (1995) (per curiam) (petitioner not entitled to "habeas relief on the basis of little more than speculation with slight support").

B.      Exclusion from Ex Parte Proceeding

Contreras' second claim is that his exclusion from the proceeding where Defense Counsel reviewed and examined the Complainant about the Note violated his constitutional rights.

"A leading principle that pervades the entire law of criminal procedure is that, after indictment found, nothing shall be done in the absence of the prisoner."  United States v. Canady, 126 F.3d 352, 360 (2d Cir. 1997) (quoting Lewis v. United States, 146 U.S. 370, 372 (1892)); accord Grayton v. Ercole, No. 10-1419, 2012 WL 3329715, at *4, ___ F.3d ___ (2d Cir. Aug. 15, 2012).  Although this right is "rooted to a large extent in the Confrontation Clause of the Sixth Amendment," Grayton, 2012 WL 3329715, at *4, it "extends as a matter of due process to 'critical stages' of the trial beyond the presentation of evidence when the defendant's 'presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.'"  Jones v. Murphy, No. 10-3997, 2012 WL 3764937, at * 10, ___F.3d___ (2d Cir. Aug. 29, 2012) (quoting Kentucky v. Stincer, 482 U.S. 730, 745 (1987)).  This right does not apply, however, if a defendant's "presence would be useless, or the benefit but a shadow."  Stincer, 482 U.S. at 745

21

(quoting Snyder v. Massachusetts, 291 U.S. 97, 108 (1934)).

In Snyder, the Supreme Court considered whether a criminal defendant had a constitutional right under the Fourteenth Amendment to attend a viewing of a crime scene during which the prosecutor and defense counsel both pointed out particular features that they wished the jurors to note.  Addressing a continuum of activity, the Court held that a "bare inspection" where nothing was said would not require the defendant's attendance because "[t]here is nothing he could do if he were there and almost nothing he could gain."  291 U.S. at 108.  Acknowledging that counsel had moved beyond a bare viewing, the Court observed that even a silent viewing is "in effect a statement that this is . . . the scene of the offense and a request to examine it."  Id. at 110.  The Court further held that when such "fact instructions" are made "explicit," the defendant is not deprived of his constitutional rights, unless "the supplement of words so transform[ed] the quality of the procedure that injustice[] was done."  Id.

Seizing upon this language, Contreras argues that the ex parte hearing in this case was such an event because the Complainant spoke about the incident and previewed the testimony she later would give at the trial.  (Pet'r's Mem. at 41-42).  Specifically, Contreras contends that, during the hearing, the Complainant "discussed . . . Contreras' alleged forcible entry into her house . . . , her allegation that the contents of her purse spilled on to the floor as [he] dragged her into the apartment, and [his] alleged questioning of the [C]omplainant about her new boyfriend."  (Id. at 42).  Despite Contreras' attempt to characterize the Complainant's hearing testimony as a preview of

22

her trial testimony, the hearing transcript confirms that the focus of the in camera hearing was the Note.  Thus, during the portion of the hearing from which Defense Counsel was excluded, the "incident" was mentioned only in the course of establishing that the Note had been written a month or more earlier.  (See Resp't's Mem. at 22-23).  Also, although there was brief testimony that the contents of the purse "fell out on the floor," there was no questioning at that stage about the physical altercation between Contreras and the Complainant or her relationship with her new paramour.

When Defense Counsel subsequently had an opportunity to question the Complainant, he, too, focused on the Note.  In addition, during his examination of the Complainant, Defense Counsel undertook a limited inquiry into subjects other than the Note that mirrored the Complainant's later trial testimony.[8]   This latter aspect of the hearing testimony, in its entirety, was as follows:

| | |
|---|---|
| DEFENSE COUNSEL: | Do you remember what happened to your purse? |
| THE COMPLAINANT: | Yes, I do.  When Roberto pushed us back inside the apartment my coat was open, therefore my bag went, as he dragged me inside the apartment, my bag fell on the floor. |
| | * * * |
| DEFENSE COUNSEL: | There were some times during the incident when you were in a separate room from Roberto? |

---

[8]     This questioning took place after Justice Stone overruled the prosecutor's objection that Defense Counsel was "going in to [sic] details as to the events of the morning of February 10th at this point."  (App. at 38).

23

THE COMPLAINANT:    When, yes.

\* \* \*

DEFENSE COUNSEL:    Wasn't he, during the incident, trying to get information about your boyfriend?

THE COMPLAINANT:    Yes, but he had information with him, the information that he had which was telephone numbers, he already had it with him in his wallet.

DEFENSE COUNSEL:    Did Roberto say anything to you during the incident that would indicate that he was upset that were having or contemplating a relationship with another man?

THE COMPLAINANT:    Yes.

(App. at 39-40).

In its decision, the Court of Appeals acknowledged that a "defendant is entitled to be personally present at all critical stages of his trial if his presence would contribute to the fairness of the procedure." Contreras II, 12 N.Y.3d at 273 (citing Kentucky v. Stincer, 482 U.S. 730, 745 (1987)).  The court nevertheless found that rule inapplicable because "the hearing was not only noncritical, but, as a matter of law, unnecessary."  Id.  As the Court of Appeals recognized, Contreras could not have meaningfully contributed to his attorney's questions and legal arguments concerning a Note about which he had no knowledge.  Similarly, to the extent that his claim is predicated on the limited testimony that his attorney elicited regarding Contreras' anger about the new relationship, Contreras was not prejudiced, since the testimony was

24

irrelevant to the subject matter of the hearing and was repeated in his presence at trial.

Contreras has not shown that an opportunity to hear the snippets of the Complainant's

testimony set forth above would have enabled him to assist Defense Counsel better than

he could by hearing substantially the same testimony only during the trial.  Indeed,

Contreras does not appear to dispute that he was aware of the Complainant's new

relationship and upset about it well before the hearing occurred.

       Contreras nevertheless argues that had he been present at the hearing, he

"could have discussed with [Defense C]ounsel the[] validity [of the Complainant's

allegations] and how better to defend himself against them."  (Pet'r's Mem. at 42).

Contreras further urges that "[i]f there was anything that the [C]omplainant testified to

that was untrue about the incident, [he] would have known and could have informed

[Defense Counsel], who would have used that information both [during the hearing] . . .

and at trial when cross examining the [C]omplainant."  (Id.).  He advances a similar claim

regarding "certain facts" that the Complainant may have "neglected to include in her

testimony."  (Id.).  Finally, Contreras argues that merely witnessing the Complainant's

demeanor during the hearing "could have alerted" him to "elements of her testimony that

were fabricated, exaggerated, or weak," thereby enabling Defense Counsel to perform

better during his cross-examination.  (Id. at 43).  Each of these contentions, however, is

based on sheer speculation:  Contreras simply has not shown that his presence would have

improved his chances of defending himself against the crimes charged.  Nor has he shown

that his ability to confront the witnesses against him at trial was in any way affected

adversely by his exclusion from the hearing regarding the Note.  In short, if Contreras' exclusion from the hearing was error, it was harmless.

    C.    Structural Error

      In Rushen v. Spain, 464 U.S. 114, 119 n.2 (1983), the Supreme Court held that a defendant's right to be present during all critical stages of the proceedings against him is subject to harmless error analysis.  Subsequently, in Yarborough v. Keane, 101 F.3d 894, 898 (2d Cir. 1996), the Second Circuit concluded that a defendant's exclusion from a hearing which was "extremely brief and . . . not even part of the trial proper" was subject to the harmless error standard.  In its decision, the Second Circuit also observed that, if the defendant's absence was error, it was of such "minimal importance to the fair structure of the criminal proceeding" that it could not fall within the classification of "structural errors" under Arizona v. Fulminante, 499 U.S. 279, 310 (1991).  The Yarborough court therefore left open the possibility that there might be situations in which the exclusion of a defendant from a proceeding could rise to the level of a "structural error."  Yarborough, 101 F.3d at 898.  If so, reversal of the defendant's conviction would be "automatic," without regard to whether the error affected the outcome of the trial.  See id. at 896 (citing Rose v. Clark, 478 U.S. 570, 578 (1986)).

      In his papers, Contreras argues that his exclusion from the hearing, combined with the ban on discussion with Defense Counsel about the Note, was so egregious as to rise to the level of structural error.  (Pet'r's Mem. at 45-47).  In effect, Contreras contends that the combination of two alleged wrongs, each of which is subject

to harmless error analysis, may amount to a structural error. Suffice it to say, the Supreme Court has never so held, nor has it suggested that either of the wrongs alleged in Contreras' Petition – either individually or in combination – gives rise to a structural error.  Therefore, Contreras cannot show that the decision of the New York Court of Appeals that any error in his case was harmless was "contrary to" or "an unreasonable application of" existing Supreme Court precedent.  Contreras consequently is not entitled to habeas relief on the theory that the errors at his trial were structural errors.

IV.   <u>Conclusion</u>

For the foregoing reasons, Contreras' petition should be denied.

V.     Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties shall have ten days from the service of this Report and

Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule

72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a),(d).  Any

such objections shall be filed with the Clerk of the Court, with courtesy copies delivered

to the chambers of the Honorable Jed S. Rakoff, and to my chambers at the United States

Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties.

See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).  Any requests for an

extension of time for filing objections must be directed to Judge Rakoff.  The failure to

file timely objections will result in a waiver of those objections for purposes of appeal.

See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140

(1985); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992).


Dated:     New York, New York
           September 11, 2012


                                  _____
                                        FRANK MAAS
                                  United States Magistrate Judge

Copies to:

Hon. Jed S. Rakoff

All counsel via ECF